Filed 1/10/23 P. v. Johnson CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LARRY ANTHONY JOHNSON,<br><br>Defendant and Appellant. | F084357<br><br>(Super. Ct. No. PCF409536)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County. Antonio A. Reyes, Judge.

Jan B. Norman, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Detjen, Acting P. J., Franson, J. and Peña, J.

Defendant Larry Anthony Johnson pled no contest pursuant to a negotiated plea agreement to voluntary manslaughter, admitted personal use of a knife in commission of the offense, admitted a prior "strike" conviction within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d))[1] and a prior serious felony conviction (§ 667, subd. (a)). Appointed counsel for defendant asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was advised of his right to file a letter stating any grounds on appeal within 30 days of the date of filing of the opening brief. Defendant filed two letters: first, contending that he was not competent when he entered his plea agreement; and second, contending that the trial court was unaware of its discretion, granted by Senate Bill No. 1393 (2017−2018 Reg. Sess.) (Senate Bill 1393), to strike his prior serious felony conviction enhancement. He has identified no basis for relief, nor have we. We affirm.

## PROCEDURAL SUMMARY

On October 12, 2021, the Tulare County District Attorney filed an information charging defendant with the murder of J.P. (§ 187, subd. (a); count 1). As to count 1, the information further alleged that defendant personally used a deadly weapon, a knife (§ 12022, subd. (b)(1)), had suffered two prior strike convictions (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and had suffered three prior serious felony convictions (§ 667, subd. (a)(1)).

On April 9, 2021, defendant entered pleas of not guilty and not guilty by reason of insanity and the trial court appointed two medical examiners to evaluate defendant's sanity pursuant to section 1026. On May 28, 2021, the court appointed an additional doctor to evaluate defendant's competency to stand trial pursuant to section 1368.

On September 16, 2021, the trial court found defendant competent to stand trial.

---

[1] All further undesignated statutory references are to the Penal Code.

2.

On November 18, 2021, pursuant to a negotiated plea agreement, defendant pled no contest to voluntary manslaughter on count 1, admitted one prior strike conviction, admitted one prior serious felony conviction, and admitted using a deadly weapon, a knife, in the commission of the offense. In exchange for his plea, the agreement provided that defendant would be sentenced to the upper term of 11 years on count 1, doubled to 22 years due to the prior strike conviction, plus a five-year serious felony conviction enhancement, plus a one-year use of a deadly weapon enhancement for an aggregate term of imprisonment of 28 years. The plea agreement also provided that defendant waived his right to appeal.

On March 9, 2022, the trial court imposed the stipulated sentence.

On May 10, 2022, defendant filed a notice of appeal. The notice of appeal was postmarked on May 5, 2022.

## FACTUAL SUMMARY[2]

Christopher Marvin was a police officer in Tulare County on March 1, 2021. At approximately 12:23 p.m. on that date, he responded to a call regarding a stabbing at a cemetery. When he and an assisting officer arrived at the cemetery, he found defendant and J.P. J.P. was standing but bent over. Defendant told Marvin, "I stabbed that mother f****r over there," and pointed to J.P. Marvin also learned from cemetery staff that J.P. had been stabbed. Marvin ran to J.P. As he ran, he observed J.P. fall to the grass. Marvin checked J.P. for injuries and located a puncture wound below J.P.'s left nipple. J.P. appeared to be unable to speak and was gasping for air. Marvin rolled J.P. to his side

---

**2**     Defendant's appointed counsel provided a summary of the facts based on the probation report after stating defendant "entered a no contest plea prior to a preliminary hearing …." That is factually incorrect. The trial court held a preliminary hearing on September 28, 2021. Defendant was held to answer on the same date. On November 18, 2021, defendant entered his no contest plea. Our factual summary is drawn from the preliminary hearing transcript.

3.

and placed him in the "recovery position." He then waited with J.P. until emergency medical responders arrived.

Others in the area pointed Marvin toward a knife and a cell phone that belonged to J.P. Both were approximately 20 to 30 feet from J.P.'s body. The knife blade was approximately eight inches long and the handle was approximately four inches long.

Daniel Bradley was an officer with the Tulare Police Department on March 1, 2021. He also responded to the call regarding a stabbing. He followed an ambulance from the cemetery to the hospital. He stayed with J.P. in the hospital and learned from the supervising emergency room doctor that J.P. had suffered a single stab wound through his heart. At 1:09 p.m., the supervising emergency room doctor declared defendant dead.

Jose Esparza was also an officer with the Tulare Police Department. On March 1, 2021, at 2:15 p.m., he interviewed E.V. E.V. told him that she and her granddaughter went for a walk and passed through the cemetery. While there, she saw defendant yelling " 'mother f****r' " and " 'son of a b***h' " at J.P. Defendant had a knife concealed behind his back and stabbed J.P. three times on the chest, near the heart. J.P. attempted to stand after being stabbed but he fell and hit his head on a tombstone. E.V. then began to record the incident. She described that after defendant stabbed J.P., he walked around as though he was not bothered. E.V. did tell Esparza that she observed which of the men was the initial aggressor.

Dan Scott was an officer with the Tulare Police Department. He was called to the cemetery in relation to the stabbing. He conducted a walkthrough of the crime scene. During the walkthrough he discovered a "silver-colored fixed-blade knife, a cellphone, … a decorative brick that was put by a [grave that] … seemed to be moved from a location that ma[de] sense for it to be in," and a pot that appeared to have been knocked over. Scott also spoke to D.J. and D.F., cemetery groundskeepers. D.J. observed J.P. fall to the ground several times. D.J. thought J.P. may be intoxicated and called D.F. over the

4.

radio. D.J. then asked J.P. if he was alright. Defendant shouted at D.J. that he had gotten into a fight with J.P. and that D.J. had "[b]etter not help [J.P.] …." Defendant also stated that J.P. had tried to hurt him and may have told D.J. that D.J. needed to help defendant. D.J. and D.F. walked together toward J.P. and defendant moved toward D.J. and D.F. in a manner they found threatening. Specifically, defendant approached D.J. and D.F. with one fist clenched and a knife held in his other hand.

Scott also spoke to J.K., who had come to the cemetery with J.P. the evening before he was stabbed. She told Scott that they sat in the cemetery and drank alcohol. Eventually the two decided to leave but J.P.'s vehicle would not start. J.P. walked away from the vehicle to contact someone to help start his vehicle. Approximately 25 to 30 minutes later, she was contacted by police officers. J.K. did not see J.P. argue with anyone and had not seen him with a knife.

After leaving the crime scene, Scott spoke to pathologist Dr. Gary Walters at the Tulare County Coroner's Office. Walters told Scott that J.P. "died of exsanguination" within minutes of suffering "a stab wound to the right ventricle of his heart." He also suffered a "superficial cut to the anterior of the left upper shoulder, [a cut to] the anterior of the left arm[,] … [an] abrasion above his right eye[,] … an abrasion on his back[,] and a defensive wound on his left ring finger."

Scott also obtained surveillance video footage from the cemetery. In viewing the video footage, he saw that defendant and J.P. were involved in "two separate [physical] fights." The first fight occurred nearer to J.P.'s vehicle. The fight lasted only a matter of moments and what each man did was not clear from the video, but defendant appeared to move away after that initial encounter. The two then separated: defendant moved toward the center of the cemetery and J.P. moved about 75 yards from the initial fight, in the direction of his vehicle.

About five to six minutes later, the two men could be seen on a different surveillance video walking parallel to each other. Defendant appeared to be yelling at

5.

J.P. and "moving his hands about wildly." Defendant then walked toward J.P. The two engaged in a second fight in which defendant made approximately three stabbing movements toward J.P.'s chest. After J.P. had been stabbed, he walked one or two steps toward defendant and defendant picked up a decorative brick and threw it at J.P. J.P. attempted to stand but fell several times. Defendant walked away from J.P.

## DISCUSSION

### *Wende* Review

As noted above, defendant's appellate counsel filed a brief pursuant to *People v. Wende*, *supra*, 25 Cal.3d 436, asserting he could not identify any arguable issues in this case. After defendant's appellate counsel filed his *Wende* brief, by letter dated October 13, 2022, we invited defendant to inform this court of any issues he wished addressed. On October 25, 2022, defendant responded to our letter, alleging that he was "incompetent the day [he] ple[]d [no contest] and waived [his] right to appeal." He contends that the trial court "made no attempt to ensure [he] was competent …."

On November 23, 2022, defendant submitted a second letter, apparently also responding to our invitation that he inform the court of issues he wished addressed. He contends that the trial court erred in concluding that it lacked the discretion to strike the prior strike conviction enhancement and the prior serious felony conviction enhancement. He contends that the trial court "was unaware that Senate Bill 1393 gave him the discretion to exercise his [j]udicial authority and strike or dismiss [section] 667, [subdivision] (a)(1)" enhancements.

In both respects, defendant's allegations are unsupported by the record.

First, on September 16, 2021, the trial court found defendant was competent to stand trial based upon the parties' stipulation that, based on his report, the doctor who completed defendant's competency evaluation would have testified that defendant was competent to stand trial.

6.

Approximately two months later, on November 18, 2021, defendant entered his no contest plea. On that date, the trial court engaged defendant in the following colloquy:

"THE COURT: All right. Now, obviously based on the amendments that are being made the agreement is going to be that you'll receive a total prison term of 2[8] years. [¶] … [¶] Do you understand that, [defendant]?

"THE DEFENDANT: Yes.

"THE COURT: Okay. Obviously[,] you're receiving a state prison commitment, so you'll be subject to, based on the nature of the charges, it may be a lifetime parole requirement. Do you understand that?

"THE DEFENDANT: Yes.

"THE COURT: You further may have fines imposed based on the convictions up to $10,000. [¶] Do you understand that consequence also?

"THE DEFENDANT: Yes.

"THE COURT: Okay. Now, have you had enough time to talk to your … lawyer?

"THE DEFENDANT: Yes.

"THE COURT: Do you have any other questions for your lawyer or the Court before I continue to take your plea?

"THE DEFENDANT: No.

"THE COURT: Are you satisfied with the advi[c]e of your lawyer?

"THE DEFENDANT: Yes.

"THE COURT: Are you taking any medications or anything of any nature that would effect your ability to understand these proceedings?

"THE DEFENDANT: No."

The trial court then inquired of defense counsel regarding his opportunity to discuss the plea with defendant:

"THE COURT: All right. Now, [defense counsel], have you had the thorough opportunity to discuss the facts of the case, the circumstances of the case, the exposures of the issues of going to trial and further the consequences of his plea with your client?

"[DEFENSE COUNSEL]: Yes, since the date of this and me being assigned to this case, I've spent hours and hours via phone and also visiting my client. We've gone through all of the risks, all of the facts of this case, and so the answer to that is yes."

The trial court then advised defendant of the impact of waiving his right to appeal prior to taking his waiver:

"THE COURT: [Defendant], further as part of the offer being made, the offer is being made on the condition that you waive your appellate rights. [¶] Do you understand that, [defendant]?

"THE DEFENDANT: Yes.

"THE COURT: So that would mean your right to appeal, your right to appeal any sentencing, your right to appeal any issues regarding any motions that may be considered by the Court prior to trial.

"THE DEFENDANT: Yes.

"THE COURT: Do you understand that you're waiving those rights, sir?

"THE DEFENDANT: Yes."

Between the date that the court found defendant to be competent and the date that it took his no contest plea, the court held a preliminary hearing on defendant's case. At that hearing, the court and defendant's counsel were able to observe defendant. Neither voiced a concern regarding his competency.

Section 1368 creates an ongoing obligation for a trial judge to state any doubts regarding a defendant's competence on the record and "inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." (§ 1368, subd. (a).) Defense counsel shares a similar obligation. (§ 1368, subd. (b).) In this case, the court and trial counsel were able to observe defendant at the restoration of

8.

competency proceedings, the preliminary hearing, and the change of plea hearing. Neither voiced concerns about defendant's competency. Indeed, at the change of plea hearing, the trial court inquired of defendant whether "anything of any nature" caused him to be unable to understand the proceedings. Defendant responded, "No." The trial court also inquired of defendant whether he understood the terms of the plea agreement, whether he was satisfied with the advice of his counsel, whether he had sufficient time to discuss the plea agreement with his counsel, and whether he understood the waiver of his right to appeal. Defendant answered in the affirmative to all those inquiries. The trial court was required to do no more to verify defendant's competence. Based on the entire record, we see no indication that the trial court erred by not delving deeper into defendant's competence on the date he entered the plea agreement; defendant was found competent two months prior to his plea and the court had no reason to believe he was no longer competent.

Second, the trial court was correct that it lacked the discretion to impose a sentence other than the sentence set forth in the plea agreement. Section 1192.5, subdivision (b), provides in relevant part, that when a "plea is accepted by the prosecuting attorney in open court and is approved by the court, … the court may not proceed as to the plea other than as specified in the plea." Here, the plea agreement expressly set out the stipulated term of imprisonment on count 1 and each enhancement. While, effective January 1, 2019, Senate Bill 1393 did generally grant trial courts the discretion to strike five-year serious felony conviction enhancements, in this case the trial court's discretion was cabined by the terms of the plea agreement which required imposition of a five-year serious felony conviction enhancement. The trial court was

9.

correct that in this case it lacked the discretion to strike the five-year serious felony conviction enhancement. The trial court did not err.[3]

After a thorough review of the record, we agree with defendant's appellate counsel there are no arguable issues in this case. There is nothing in this record to suggest any error occurred.

## **DISPOSITION**

The judgment is affirmed.

---

**3** We note that because defendant waived his right to appeal his sentence as set out in the plea agreement, we need not have reached the merits on this claim. We did so only in an abundance of caution.

"[A] defendant [may] waive the right to appeal as part of the [plea] agreement," as long as the waiver is "knowing, intelligent, and voluntary." (*People v. Panizzon* (1996) 13 Cal.4th 68, 80.) " 'A negotiated plea agreement is a form of contract, and it is interpreted according to general contract principles. [Citations.]' [Citation.] Likewise, '[b]ecause waivers of appellate rights are ordinarily found in the context of a plea bargain, the scope of the waiver is approached like a question of contract interpretation—to what did the parties expressly or by reasonable implication agree? [Citations.]' " (*People v. Becerra* (2019) 32 Cal.App.5th 178, 188–189.) On the record, as set out above, we are convinced that defendant's waiver of his right to appeal his conviction and sentence were knowing, intelligent, and voluntary. The trial court imposed the specific sentence the parties bargained for. The purported error that defendant complains of is therefore not a future error outside of defendant's contemplation at the time he waived his appellate rights. (*Panizzon*, at pp. 85–86.) Defendant's challenge to his sentence as set out in the plea agreement is therefore waived.

We further note that defendant entered his plea after the effective date of Senate Bill 1393. Our rejection of defendant's claim that the trial court did not understand its discretion did not involve a waiver of unknown future benefits of legislative enactments. (See § 1016.8, subd. (a)(4).)